UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EVANSTON INSURANCE
COMPANY and MARKEL
AMERICAN INSURANCE
COMPANY,

    Plaintiffs,

v.            Case No. 8:22-cv-287-MSS-AEP

SONNY GLASBRENNER, INC. and
CONE & GRAHAM, INC.,

    Defendants.

_____/

## REPORT AND RECOMMENDATION

  This cause comes before the Court upon Evanston Insurance Company's ("Plaintiff" or "Evanston") Motion for Judgment on the Pleadings (Doc. 45), Defendants Sonny Glasbrenner, Inc. ("SGI") and Cone & Graham, Inc.'s ("C&G") (collectively, "Defendants") response in opposition (Doc. 54), and Plaintiff's reply thereto (Doc. 109). For the reasons state below, the undersigned recommends Evanston's motion be denied.

### I. Background

  Evanston filed this action against Defendants seeking a declaratory judgment that it has no obligation to defend or indemnify SGI against the claim made by C&G arising out of SGI's work on the I-275 SB Ramp to I-75 NB Bridge Redecking project (the "Project") (Doc. 1, ¶ 3).

### A. The Project

This case arises from a contractual relationship between SGI and C&G. On May 8, 2018, C&G contracted with SGI to serve as a subcontractor to C&G on the Project (Doc. 1-3, (the "SGI Subcontract"); Doc. 23, ¶ 15). The Project was to rehabilitate the bridge due to deterioration of the existing concrete bridge deck by adding additional cross bracing to further stiffen the steel girders and using special lightweight concrete (Doc. 1-2, at 2). C&G contracted SGI to demolish the existing concrete bridge deck on the Project (Doc. 1-2, at 2). SGI began performing work on the Project on August 1, 2018 and completed its work in December 2018 (Doc. 1, ¶ 25; Doc. 23, ¶ 25).

Schedule A to the contract between C&G and SGI describes the work to be performed as "removal of existing structures/bridges" (Doc. 1-3, at 8). The scope of work is described as follows:

> Perform selective demolition according to plan specifications listed above, to include only the following: saw cut & remove bridge concrete deck, saw cut *& remove traffic railing, all to girders*, approach slab wing walls 1 & 20, and jackhammer any remaining portions of concrete deck around pins, as directed.

(Doc. 1-3, at 9).

On November 13, 2020, C&G made a demand to SGI for alleged damage caused by SGI's work on the Project (Doc. 1, ¶ 14; Doc. 23, ¶ 14). According to the demand letter, SGI was negligent in performing its demolition work, causing substantial damages to the existing bridge girders (Doc. 1-2, at 2).

### B. Underlying Action

C&G filed an action against SGI in state court for damages arising out of SGI's work on the Project – *Sonny Glasbrenner, Inc., Assignor, to Larry S. Hyman, Assignee,* Case No. 21-003289-CI, filed in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida (the "Underlying Action") (Doc. 1, ¶ 3; Doc. 23, ¶ 3). C&G filed an Amended Proof of Claim in the Underlying Action, asserting the following:

> During the course of SGI's work on the Project, SGI personnel, while saw-cutting concrete decks, negligently failed to continuously and properly monitor the extension of the concrete saw blade. As a direct and proximate result of SGI's negligence and/or breach of contract, SGI cut into existing beams or girders, existing spliced plates, and structural bolts on the Project, causing substantial property damage to the Project.

(Doc. 1-1, at 3); *see also* (Doc. 23, ¶ 20).

During the relevant time period, SGI was insured under a commercial general liability ("CGL")[1] policy issued by Everest Denali Insurance Company for the policy period of April 20, 2018 to April 20, 2019 (Policy No. CFG3L00085181) (the "Everest Policy") (Doc. 1-6; Doc. 1, ¶ 45; Doc. 23, ¶ 45). During this same policy period, SGI was also insured under a commercial excess liability policy by Evanston (Policy No. MKLV2EUL102408) (the "Evanston Policy") (Doc. 1-4; Doc. 1, ¶ 26; Doc. 23, ¶ 26). Evanston denied coverage to SGI for the claims and

---

[1] CGL policies "are standard insurance policies developed by insurance industry trade associations, and these policies are the primary form of commercial insurance coverage obtained by businesses throughout the country." *Dimmitt Chevrolet, Inc. v. Se. Fid. Ins. Corp.,* 636 So. 2d 700, 702 (Fla. 1993).

damages asserted in C&G's Amended Proof of Claim based on the Contractor's Services Exclusion in the Evanston Policy and exclusions to coverage j(5) and j(6) in the Everest Policy (Doc. 23, at 26 ¶ 19). Everest agreed to a settlement with C&G for $1,000,000 per occurrence policy limit while reserving all rights against SGI's excess insurer, Evanston (Doc. 23, at 28 ¶ 24). Evanston filed an objection to C&G and Everest's joint motion to approve the settlement agreement (Doc. 23, at 28 ¶ 25).

### C. Insurance Policy Provisions

#### i. Evanston Policy

The Insuring Agreement states as follows: "We will pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the 'underlying insurance' also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance" (Doc. 1-4, at 11). The Evanston Policy contains a "Damage to Property" exclusion to coverage in the Contractor's Services Exclusion, which provides as follows:

> Damage To Property
>
> Property damage to:
> a. Any property or equipment rented, leased or loaned to any insured;
> b. Property being installed or erected by or for any insured; or
> c. That particular part of real property on which work is being performed by or for any insured.

(Doc. 1-4, at 11).

### ii. Everest Policy

The Everest Policy states that it "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which th[e] insurance applies" (Doc. 1-6, at 18). The Everest Policy defines property damage as follows:

> a.      Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b.      Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Doc. 1-6, at 32). Moreover, the Everest Policy contains the following exclusions to coverage:

> 2. Exclusions
> This insurance does not apply to: . . . .
>
>> j. Damage To Property
>> "Property damage" to: . . .
>>
>>> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>>>
>>> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Doc. 1-6, at 19, 21-22).

In the instant case, C&G has filed a counterclaim against Evanston alleging breach of contract for failure to indemnify SGI pursuant to the Allowed Proof of Claim and breach of contract for failure to indemnify SGI under the proposed

settlement (Doc. 23, at 29-32 ¶¶ 29-38). Evanston now requests that the court determine, based on the pleadings, that Evanston has no duty to defend or indemnify SGI, and is entitled to judgment on all counts of its Complaint and C&G's Counterclaim.

## II.   Legal Standard

"A motion for judgment on the pleadings is governed by the same standard as a Rule 12(b)(6) motion to dismiss." *StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc.*, No. 8:13-cv-2240-VMC-MAP, 2015 WL 518852, at *1 (M.D. Fla. Feb. 9, 2015) (citations omitted); *ThunderWave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1564 (S.D. Fla. 1997) ("The standard of review for Rule 12(b)(6) and Rule 12(c) motions are identical.") (citations omitted). Generally speaking, courts "will not consider matters outside the pleadings when passing on a Rule 12(c) motion." *Horsley v. Feldt*, 304 F.3d 1125, 1136 n.6 (11th Cir. 2002). However, courts "may also consider documents attached to the plaintiff's complaint if they are (1) central to the plaintiff's claim and (2) undisputed." *Bank of Camilla v. St. Paul Mercury Ins. Co.*, 531 F. App'x 993, 994 (11th Cir. 2013).[2]

Judgment on the pleadings is appropriate where no issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. *Mergens v. Dreyfoos,* 166 F.3d 1114, 1117 (11th Cir. 1999); *see also Hawthorne v. Mac Adjustment*, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998) ("Judgment on the pleadings

---

[2] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts."). The moving party bears the burden of proving they are entitled to dismissal. *See Hawthorne*, 140 F.3d at 1370. "In determining whether a party is entitled to judgment on the pleadings, [the court] accept[s] as true all material facts alleged in the non-moving party's pleading, and [the court] view[s] those facts in the light most favorable to the non-moving party." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

### III.   Discussion

#### A. Procedural Argument

As a preliminary matter, the undersigned will address C&G's argument that Evanston's motion should be denied because Evanston has denied the allegations contained in C&G's Counterclaim and C&G has denied the allegation in Evanston's Complaint. C&G relies on *Gachette v. Axis Surplus Ins. Co.*, for the proposition that if a party moving for judgment on the pleadings under Rule 12(c) has previously denied the allegations contained in the non-moving party's pleading, such denial – standing alone – will require denial of a Rule 12(c) motion. No. 19-CV-23680, 2020 WL 2850587, at *1 (S.D. Fla. Apr. 1, 2020). In *Gachette*, the defendant filed its answer where it denied almost all of the material allegations in the complaint. *Id.* The court held that without instructive case law from the Eleventh Circuit, the court could not simply overlook the contradictory stance on the

allegations and disregard the denials. *Id.* Therefore, the motion for judgement on the pleadings was denied.

Here, Evanston filed the Complaint, C&G denied many of the material allegations in the Answer, C&G also filed a Counterclaim, which Evanston responded to by denying many of the material allegations therein. This, in it of itself, is not grounds for denial of Evanston's motion. Rather, as previously noted, on a motion for judgment on the pleadings, a court must accept as true the factual allegations in the non-moving party's pleadings and draw all reasonable inferences in its favor and treat as false allegations in answers that contradict its allegations. *See Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916 (11th Cir. 2023). Accordingly, the court will review the facts alleged in the Complaint in the light most favorable to C&G, accept as true all material facts alleged in C&G's Counterclaim and view them in the light most favorable to C&G.

### B. Insurance Policy Construction

Evanston's motion hinges on the interpretation of the insurance contract between the parties. Under Florida law, courts construe insurance contracts using their plain meaning. *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291-92 (Fla. 2007) (quotation marks omitted). However, insurance policies that are "ambiguous or otherwise susceptible to more than one meaning must be construed in favor of the insured." *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986). Specifically, exclusionary clauses are construed strictly against the insurer because they tend to limit or avoid liability. *Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1309-

10 (11th Cir. 2008); *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). "When an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Acosta, Inc. v. National Union Fire Ins. Co.*, 39 So. 3d 565, 574 (Fla. 1st DCA 2010) (quotation marks omitted). Regardless, where "a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005).

Under Florida law, "[t]he duty to defend must be determined from the allegations in [the underlying action]." *Jones v. Fla. Ins. Guar. Ass'n, Inc.*, 908 So. 2d 435, 443 (Fla. 2005) (citations omitted). "The duty to defend arises when the relevant pleadings allege facts that fairly and potentially bring the suit within policy coverage." *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1323 (11th Cir. 2014) (quotation marks omitted). The duty to defend is "separate and apart from the duty to indemnify and the insurer may be required to defend a suit even if the later true facts show there is no coverage." *Trizec Props., Inc. v. Biltmore Constr. Co., Inc.*, 767 F.2d 810, 812 (11th Cir. 1985). As such, an insurer's duty to defend is "of greater breadth than the insurer's duty to indemnify." *Jones*, 908 So. 2d at 443; *see Trailer Bridge, Inc. v. Ill. Nat'l Ins. Co.,* 657 F.3d 1135, 1146 (11th Cir. 2011) ("[A] court's determination that the insurer has no duty to defend requires a finding that there is no duty to indemnify.").

### C. Insurance Policies

The parties' dispute concerns whether the Underlying Action properly alleges "property damage" as defined and whether the exclusions to coverage apply in this case. The undersigned will take each in turn.

#### i.  Everest Policy

#### 1.  "Property Damage"

Evanston argues that because the Everest policy does not provide coverage for the Underlying Action, there is no coverage under the Evanston Policy. To revisit, the Everest Policy states that it "will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which th[e] insurance applies" (Doc. 1-6, at 18). The Everest Policy defines property damage as follows:

> a.      Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b.      Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Doc. 1-6, at 32).

Evanston contends that because the Underlying Action does not allege "property damage" as defined in the Everest Policy, there is no coverage under the Everest Policy and thus, no coverage under the Evanston Policy. Evanston draws this distinction by arguing that SGI was hired to perform demolition and therefore, the business risk of SGI was that it would cause damage to a part of the bridge

10

beyond that which it was contracted to demolish. Evanston contends that the insurable liability is the risk that SGI's demolition would cause injury to a person or other property such as a nearby automobile or adjacent structure. Thus, according to Evanston, the business risk – damaging parts of the bridge SGI had not intended to damage – is not a liability intended to be covered by the Everest policy.

Evanston relies on *Amerisure Mut. Ins. Co. v. Auchter*, where the Eleventh Circuit found that no "property damage" existed from the insured's defective installation of a roof. 673 F. 3d 1294, 1307-08 (11th. Cir 2012). Ultimately, the court held that "the Florida Supreme Court has drawn a distinction between 'a claim for the cost of repairing the subcontractor's defective work,' which *is not* covered under a CGL policy, and 'a claim for repairing the structural damage to the completed [project] caused by the subcontractor's defective work,' which *is* covered. *Id*. at 1306 (quoting *U.S. Fire Ins. Co. v. J.S.U.B., Inc.,* 979 So. 2d 871, 890 (Fla. 2007)). In other words, "there is no coverage if there is no damage beyond the faulty workmanship, i.e., unless the faulty workmanship has damaged some otherwise nondefective component of the project." *Id*. (quotation marks omitted) (citation omitted) (alteration omitted). Therefore, because the underlying claim alleged that the roof had been defectively installed resulting in damage to the roof and the need to replace the entire roof system, rather than allege that any part of the property other than the roof was damaged by the defective installation, this was a claim for the cost of repairing the subcontractor's defective work and did not allege "property damage." *Id*. at 1307; *see also W. Orange Lumber Co. v. Indiana Lumbermens Mut. Ins. Co.*, 898

So. 2d 1147, 1148 (Fla. 5th DCA 2005) (holding that the cost of removing and replacing siding shingles which did not conform to contract specifications was not property damage because "the only damage alleged was the cost or expense to the vendor to remove the defective product and supply an acceptable substitute.").

Evanston also relies on *LaMarche v. Shelby Mutual Insurance Co.,* for the proposition that damaging parts of the bridge that SGI had not intended to damage is not a liability intended to be covered by CGL insurance, rather, it is a consequence of not performing well which is a business risk. 390 So. 2d 325, 326 (Fla. 1980). *LaMarche* involved a claim for a contractor's faulty workmanship in the construction of a home, which the homeowners argued caused structural defects and consequent secondary damage. *Id.* The court held that rather than coverage and payment for building flaws or deficiencies, the policy instead covered damage caused by those flaws. *Id.* The court relied on a New Jersey Supreme Court decision, *Weedo v. Stone-E-Brick, Inc.,* in reasoning that business risks are distinguishable from occurrences giving rise to insurable liability. *Id.* at 326-27 (citing *Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 405 A.2d 788 (N.J. 1979)). To illustrate this distinction, *Weedo* explained that when a craftsman applies stucco to an exterior wall of a home in a faulty manner which causes discoloration, peeling, and chipping, the poorly performed work will have to be replaced or repaired. *Id.* at 791. On the other hand, if the stucco peels and falls from the wall, causing "injury to the homeowner or his neighbor standing below or to a passing automobile, an occurrence of harm arises which is

the proper subject of risk-sharing as provided by the type of policy . . . ." *Id.* at 791-92.

However, in *U.S. Fire Ins. Co. v. J.S.U.B. Inc.,* the Florida Supreme Court again addressed the meaning of "property damage" within a standard CGL and whether a CGL policy provided coverage when a claim was made against the general contractor (the named insured) for damages to a completed project caused by a subcontractor's defective work. 979 So. 2d at 871. In addressing *LaMarche*, the court concluded that "the holding in *LaMarche,* which relied on *Weedo* and involved the issue of whether there was coverage for the contractor's own defective work, was dependent on the policy language of pre-1986 CGL policies, including the relevant insuring provisions and applicable exclusions." *Id.* at 882.[3] Thus, because *LaMarche* involved a claim of faulty workmanship by the contractor, rather than a claim of faulty workmanship by the subcontractor, and because the policy being interpreted involved distinct exclusions and exceptions, the Florida Supreme Court found that *LaMarche* was not binding precedent. *Id.* Moreover, the court declined to read the broad "business risk" exclusions at issue in *LaMarche* into the definition of "occurrence" used in the coverage provisions of the post-1986 standard CGL policies at issue in this case. *Id.* at 885.

---

[3] Since 1940, the standard CGL policy has been revised several times, including in 1986 which modified the business risk exclusions to include the j(5) and j(6) exclusions to coverage. *Bradfield v. Mid-Continent Cas. Co.*, 143 F. Supp. 3d 1215, 1233 (M.D. Fla. 2015).

The cases cited by Evanston, *Auchter* and *W. Orange Lumber Co.*, only contained allegations of damages to repair and replace the insured's work, unlike in the instant case where the allegations are for property damage caused by the occurrence of the insured's allegedly faulty workmanship. The pleadings reflect that SGI was contracted to demolish and remove the existing concrete bridge deck on the Project and the scope of work did not include any work on the existing beams, girders, spliced plates, or structural bolts, all of which were to be left untouched. According to the allegations, SGI's negligence led to physical injury to otherwise nondefective property.

In fact, the Amended Proof of Claim specifically states the following:

> During the course of SGI's work on the Project, SGI personnel, while saw-cutting concrete decks, negligently failed to continuously and properly monitor the extension of the concrete saw blade. As a direct and proximate result of SGI's negligence and/or breach of contract, SGI cut into existing beams or girders, existing spliced plates, and structural bolts on the Project, causing substantial property damage to the Project.

(Doc. 1-1, at 3). Additionally, it states that the "damaged beams and girders, spliced plates, and structural bolts were not part of the property which was the object of SGI's contracted-for work" and "were outside the scope of SGI's contracted-for work on the Project" (Doc. 1-1, at 3). The Underlying Action did not allege damages to the concrete bridge deck, which SGI had been contracted to demolish. Rather, the Amended Proof of Claim claims that SGI caused property damage to areas outside its intended scope. Thus, although there is no coverage for faulty workmanship, there may be if the faulty workmanship has damaged some otherwise

nondefective component of the project, which C&G sufficiently alleged in the Underlying Action.

## 2. Exclusions

Evanston further argues that even if the Underlying Action alleged a claim against SGI for "property damage," the Everest Policy excludes coverage for "property damage" to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations" (Doc. 45, at 12). Moreover, Evanston argues that the Everest Policy also excludes coverage for "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it" (Doc. 45, at 12). Evanston concludes that because the Everest Policy does not cover the Underlying Action, its limits cannot be properly exhausted by any payment to resolve the Underlying Action, and therefore, the Evanston Policy is not triggered.

The Everest Policy contains the following exclusions:

2. Exclusions
This insurance does not apply to: . . . .

    j. Damage To Property
    "Property damage" to: . . .

        (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Doc. 1-6, at 19, 21-22).

Exclusions j(5) and j(6), which Florida courts regularly evaluate together, cover the pieces of real property "the contractor's operations were intended to include." *Wilshire Ins. Co. v. Birch Crest Apartments, Inc.*, 69 So. 3d 975, 976 (Fla. 4th DCA 2011). Evanston argues that *Amerisure Mut. Ins. Co. v. Am. Cutting & Drilling Co.*, is directly on point and supports the court finding that coverage is excluded here. No. 08-60967-CIV, 2009 WL 700246, at *4 (S.D. Fla. Mar. 17, 2009). In *Am. Cutting*, the insured, American Cutting, was hired to cut concrete to enlarge concrete holes. *Id*. American Cutting knew that there were cables embedded in the concrete slab and that cables were an integral part of the floor but was not supposed to cut any steel or cables while performing its job cutting the holes. *Id*. at *7. However, the areas of the floor where it was enlarging holes had cables running through the concrete and American Cutting caused steel cables to be severed or damaged. *Id*. at *5. The property owner alleged that American Cutting's actions resulted in property damage, specifically damage to the cables which caused the property owner to incur "the cost of repairing and replacing the cables; the cost of breaking through walls and floors to gain access to the cables that needed to be replaced and repaired, and the cost of overtime required by the delays caused by the severed cables." *Id*. In interpreting exclusions j(5) and j(6), the court found that American Cutting had to work on concrete floor areas that included embedded cables to cut the concrete and

enlarge the holes, and American Cutting was working on the area of concrete that included embedded cables when the cables were damaged. *Id*. at *6. The court found that because the damages alleged in the counterclaim against American Cutting delt with damage to the cables and no other property, damage to the cables was excluded under the policy *Id*. The court reasoned that "[t]hat particular part of real property" should be taken and understood in the ordinary sense as the part of the project where American Cutting was cutting through concrete, i.e., the areas of the floor where it was enlarging the holes, and because these floor areas had cables running through the concrete, "'that particular part of real property' was the area of the concrete floor, including the embedded cable, where American Cutting was chipping concrete." *Id*. at *5. The court held that exclusion j(5) applied because American Cutting was chipping concrete (performing operations) on areas of the concrete floor that included embedded cables (that particular part of real property) and damage to the cables (property damage) resulted from American Cutting's concrete chipping (operations). As a result, the court concluded, there was no coverage and no duty for the insurer to defend American Cutting in the underlying action. *Id*. As to exclusion j(6), the court found that exclusion j(6) precluded coverage because cables had to be repaired and replaced as a result of American Cutting incorrectly performing its concrete cutting/chipping on the floor areas where the cables were embedded. *Id*. at *7.

The court in *Am. Cutting* analogized its analysis to the court's reasoning in *American Equity Ins. Co. v. Van Ginhoven,* 788 So. 2d 388 (Fla. 5th DCA 2001). In

*Van Ginhoven*, a homeowner hired Van Ginhoven to make minor repairs to the surface of her swimming pool. *Id*. at 390. Specifically, the contract called for Van Ginhoven to make spot repairs, clean the pool surface, and replace up to six tiles. *Id*. In order to do this, Van Ginhoven had to drain the pool, which the homeowner understood it to be necessary. *Id*. While draining the pool, the pool popped out of the ground resulting in damage to the pool, pump, heating system, deck, screen enclosure and surrounding landscaping, and sprinkler system. *Id*. The court addressed the same exclusions present in this CGL policy. Van Ginhoven argued that the exclusions only applied to the specific tiles and spot repairs, not the entire pool. *Id*. at 391. The court disagreed and found that (j)(5) excluded from coverage all damage to the pool, not only the damage to the tiles targeted for repair, because "[a]t the time the damage occurred, Van Ginhoven was not working, or performing operations on, the spots subject to repair, but was draining the entire pool." *Id*. Thus, damage to the entire pool was excluded from coverage but damage to other property that he was not working on such as the pump, heating system, deck, screen enclosure and the surrounding landscaping and sprinkler system, was covered. *Id*.

Evanston also cites to *Travelers Indem. Co. of Connecticut v. Richard Mckenzie & Sons, Inc.*, in support of its argument that the exclusions apply because SGI was working on the bridge. 10 F.4th 1255 (11th Cir. 2021). In *Richard Mckenzie & Sons*, the insured was hired to manage citrus groves, including planting the trees, maintaining the groves, and picking the fruit. *Id*. at 1258. The complaint alleged that the property owner incurred damages that included having to push or clear

acres of land on the citrus groves to compensate for the insured's past improper care. *Id.* at 1262-63. In analyzing exclusion j(5), the Eleventh Circuit noted that in order to define "[t]hat particular part of real property," it first had to define the insured's "operations" as it related to the exclusion – "[*t*]*hat particular part of real property* on which you . . . are performing *operations*, if the 'property damage' arises out of those *operations*." Citing Florida law, the court noted that "operations" in exclusion j(5) means "work done in the performance of the insured contractor's contract." *Id.* at 1263 (quoting *Nova Cas. Co. v. Willis*, 39 So. 3d 434, 436 (Fla. 3d DCA 2010)). The court found that because the complaint alleged that the insured's contracted operations broadly covered the groves, the real property on which the insured performed operations was the entire groves. *Id.* Therefore, all of the damage caused by the insured to the citrus groves was barred by exclusion j(5). *Id.*

Evanston also relies on an Ohio case which it argues is very similar to the instant case. In *Welfle, Inc. v. Motorist Ins. Grp.*, the insured entered into a contract to remove asphalt from a bridge. 2007-Ohio-1899, 2007 WL 1174652, at *1 (Ohio App. Ct. 9th Dist. Apr. 23, 2007). The insured set its milling machine to grind too deeply, damaging the concrete deck underneath the asphalt. *Id.* The issue before the Ohio appellate court was whether the concrete deck was either "[t]hat particular part of real property" on which the insured was "performing operations" or "[t]hat particular part of any property" that had to be repaired because the insured incorrectly performed work "on it." *Id.* The court found that the insured misused its rotomill while using it to remove asphalt from the bridge deck thereby damaging

the underlying concrete bridge deck. *Id*. The court held that exclusion j(6) applied because the bridge deck had been damaged as a result of the insured's incorrect performance on it. *Id.*

The undersigned is not persuaded that these cases are analogous to the instant case. Both *Am. Cutting* and *Van Ginhoven* are distinguishable from the instance case. In *Am. Cutting*, the cables were embedded in the concrete that American Cutting was working on. It knew that the cables were there and had to cut and chip around it to perform its work of enlarging the concrete holes. Thus, American Cutting was working on that particular part (the area of the concrete floor which included the embedded cable) and property damage to that particular part occurred as a result of American Cutting's operations. Similarly, in *Van Ginhoven*, the homeowner and Van Ginhoven knew that the pool had to be drained in order to perform the work contracted and Van Ginhoven was in the process of performing that work on that particular part (the pool) when the pool popped out of the ground. Here, nothing in the pleadings suggest that the support beams, girders, and other damaged property were embedded with the concrete bridge deck or that the parties knew that in order to demolish the concrete bridge deck, the support beams, girders, or other damaged property would need to be worked on.

Moreover, exclusion j(6) specifically excludes from coverage property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on *it*" meaning incorrectly performed on that particular part. In *Welfle*, the insured was performing work on

the bridge deck, essentially removing a layer of asphalt from the concrete. Here, SGI was not performing work on the beams or girders or any other part outside of the concrete bridge deck. SGI had no need or circumstances to perform work on those parts. In fact, the contract specifically details the limits to SGI's work and that it is not perform any work outside the concrete deck (*see* Doc. 1-3, at 8-9).

Evanston argues that there are no allegations that SGI departed from its scope of work while saw-cutting the bridge; rather that SGI was performing its scope of work when the bridge was damaged – SGI negligently caused damage to the bridge by cutting into beams, girders, and platers, all while performing its contractual duties. C&G, on the other hand, argues that the damaged portions of the Project, the support beams and girders, etc., were separate from the concrete bridge deck and were outside SGI's scope of work. C&G contends that if the beams and girders had extended up into the bridge deck, the scenario may have been different. Essentially, Evanston argues that "particular part" is the bridge and includes the bridge deck, the beams, girders, and other damaged property, not just the bridge deck. However, at this stage of the proceedings, it is not clear whether the damage allegedly attributable to SGI in the Underlying Action would have been within the "natural and intended scope" of its operations on the bridge deck. *See Wilshire*, 69 So. 3d at 976. For instance, if SGI had to work on the beams or girders in order to remove the concrete bridge deck. To the extent that Evanston implies that property damage that occurs while the insured is performing its contractual duties is excluded, the undersigned does not find that to be a reasonable

interpretation of the exclusion. Under this interpretation, all property damage that occurred during the insured's work would be excluded, which would include property damage to adjacent areas.

In its reply, Evanston asserts that there is no dispute that the beams and girders are part of the bridge on which SGI was performing operations and that the Project included work on the girders to meet current design standards and load rating requirements (Doc. 109, at 5). While it may not be disputed that all of these components make up a bridge, there is a dispute as to whether SGI's work on the bridge deck extends to the bridge as a whole. Florida case law makes a distinction between what the insured was working "on" and other property that may be adjacent. *See Nova Cas. Co.*, 39 So. 3d at 436-437 (finding that exclusions j(5) and j(6) did not apply when the contractor incorrectly trimmed the homeowner's trees and departed from the scope of operations by trespassing onto adjacent property and trimming trees that did not belong to the homeowner; while damage done to the homeowner's mangroves where the work was being performed was not covered, coverage applied to damage done to the mangroves in the adjacent property because those were not in the contractor's intended scope of work); *Essex Ins. Co. v. Kart Const., Inc.*, 2015 WL 4730540 (M.D. Fla. Aug. 10, 2015) (finding that (j)(5) excludes from coverage only damage to the part of the real property on which the insured is operating at the moment of accident; thus, the exclusion did not apply to the destruction of the entire 127-foot cellular tower due to a fire because at the time

the fire occurred, the insured was performing welding operations on a ten-foot portion of the tower, which was excluded).

The contract between SGI and C&G specifically references demolishing the concrete bridge deck up to the girders (Doc. 1-3, at 8-9). The contract does not contemplate any actual work on the girders and nothing in the pleadings suggests that working on the girders or beams was contemplated. The fact that the contract states that SGI will be responsible for damage to beams only supports that SGI was not supposed to work on the beams. It would have been similar if the contract stated that SGI would be responsible for damage to the bridge pillars, or to the road under the bridge. Again, at this stage of the proceedings, under the present standard, the court must look to the pleadings and evaluate whether the moving party has shown that the facts, when viewed in light most favorable to the non-moving party is entitled to judgment as a matter of law. That is not the case here.

### ii.   Evanston Policy

Evanston also argues that coverage in the Underlying Action is excluded by the plain language of the Evanston Policy's Damage to Property exclusion because C&G's claims solely involve damage to real property on which work was being performed by the insured, SGI. Evanston contends that unlike the standard business risk exclusions discussed above, the Damage to Property exclusion in the Evanston Policy is not limited to SGI's scope of work or damage arising from SGI's operations. Rather, the Evanston Policy precludes coverage for "property damage" to real property on which any insured was performing work regardless of the cause.

C&G responds that the practical scope of the Damage to Property in the Evanston Policy is the same as the scope of exclusions j(5) and j(6) in the context that coverage is excluded for "property damage" to the "particular part of real property" on which the insured's "work" is being performed (Damage to Property Exclusion) or on which the insured is performing "operations" (exclusion j(5)). C&G argues that there is nothing in the Damage to Property exclusion which would result in it applying more broadly than exclusions j(5) and j(6).

C&G correctly points out that Evanston does not cite to any authority in support of its argument that its Damage to Property exclusion is in some way broader than j(5) and j(6). Regardless, in reviewing the plain language of the Evanston Policy's coverage exclusion to property damage to "[t]hat particular part of real property on which work is being performed by or for any insured," it does not apply to the property damage to the beams and girders, spliced plates, and structural bolts, because according to the allegations, SGI was performing work on the bridge deck, not the entire bridge.

Lastly, Evanston argues that it is entitled to judgment on the pleadings on both counts of C&G's Counterclaims because there is no coverage for the Underlying Action, thus Evanston has no duty to defend or indemnify SGI for the Underlying Action, and thus could not have breached the insurance policy by failing to pay the Underlying Action, nor could it be required to consent to a settlement partially resolving the Underlying Action with the proceeds of the Everest Policy when there is no coverage under the Everest or Evanston Policies. However, given

the undersigned's recommendation regarding the coverage and exclusions on its declaratory action, the undersigned does not recommend finding Evanston entitled to judgement on the pleadings on both counts of C&G's Counterclaim.

Accordingly, it is hereby

RECOMMENDED:

1. Evanston's Motion for Judgment on the Pleadings (Doc. 45) be DENIED.

IT IS SO REPORTED in Tampa, Florida, this 20th day of October, 2023.

ANTHONY E. PORCELLI
United States Magistrate Judge

**NOTICE TO PARTIES**

A party has fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections. 28 U.S.C. § 636(b)(1)(C). A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1). **Should the parties wish to expedite the resolution of this matter, they may promptly file a joint notice of no objection.**

cc:     Hon. Mary S. Scriven
        Counsel of Record